State of Wisconsin, Plaintiff-Respondent,
v.
MC Winston, Defendant-Appellant.
No. 03-3412-CR.
Court of Appeals of Wisconsin.
Opinion Filed: September 8, 2004.
Before Wedemeyer, P.J., Fine and Kessler, JJ.
¶1 PER CURIAM.
MC Winston appeals from a judgment entered on a jury verdict convicting him of second-degree sexual assault of a child. See WIS. STAT. § 948.02(2) (2001-02).[1] He also appeals from an order denying his postconviction motion for a new trial. Winston claims that the trial court erred when it denied his postconviction motion without an evidentiary hearing because: (1) the State did not disclose what he alleges is exculpatory evidence; (2) the allegedly exculpatory evidence was newly discovered evidence; (3) his trial lawyer was ineffective; and (4) he is entitled to a new trial in the interest of justice. We affirm.

I.
¶2 MC Winston was charged with one count of second-degree sexual assault of a child for allegedly having sexual intercourse with then fifteen-year-old Candida S. on October 5, 2001. Winston pled not guilty and went to trial. Before the trial, Winston filed a Demand for Discovery and Inspection, which requested, among other things, that the State: "Furnish the defense with any and all exculpatory evidence, including police reports or any other information within the possession, knowledge or control of the State which could form the basis for further investigation by the defense." As relevant, the State turned over a copy of Milwaukee Police Department Property Inventory 180792. Inventory 180792 recited that it was prepared on December 17, 2001, at 5:10 p.m. According to the Inventory, Milwaukee Police Officer Jody Young collected two purple-topped vials of blood from Winston at the House of Correction and inventoried them as part of the sexual assault investigation.
¶3 The State also turned over a transmittal report sent from the Milwaukee Police Department to the State Crime Laboratory. In the transmittal, the police asked the crime laboratory to "please examine inventory #173752 1-15 (collected from victim while at Sinai Hospital) inventory #180783 1 of 1 (collected from suspect while at [House of Correction]) for the presence of cellular material." (Uppercasing omitted.) Below the request, the transmittal referred to Inventories 173752 and 180792. The State did not provide Winston with, and his trial lawyer did not ask for, Inventory 180783.
¶4 The case was tried to a jury in March of 2002, on an amended charge of second-degree sexual assault on the basis of sexual contact. The jury was unable to reach a verdict and the trial court ordered a mistrial. After the mistrial, Winston's lawyer withdrew and a new lawyer was appointed. The information was amended to charge Winston with two counts of second-degree sexual assault, one for sexual contact and one for sexual intercourse. Winston went to trial in September of 2002.
¶5 At the second trial, Candida, then sixteen, testified that instead of going to school on October 5, 2001, she went to the Kandy Konnektion, a candy store, on National Avenue in the City of Milwaukee, to buy cigarettes. Candida told the jury that, when she got to the store, she saw Winston, a store employee whom she knew, and told him that she would "kick it" with him for the day. According to Candida, she and Winston left the store around lunchtime to get Chinese food. While they were out, Winston also bought gin, lemonade, and beer at a nearby store.
¶6 Candida testified that, after they returned to the candy store, Winston and another employee ate the Chinese food, while she drank some of the gin and lemonade that Winston had poured into a soda bottle. Candida claimed that Winston then let her into a storage room and she and Winston sat down on a mattress, where she continued to drink the gin and lemonade. She told the jury that, at that point, she was starting to "feel" the alcohol.
¶7 Candida testified that, while they were sitting on the mattress, Winston started to stroke her hair, so she slapped Winston's hand and told him to stop. Candida told the jury that Winston then moved her so that she was lying on her back and took off her pants. Candida testified that she pushed Winston's hands away, but that he took off her underwear and shoes. According to Candida, Winston then unbuttoned his pants, put his penis in her face, and told her to suck on it. Candida testified that Winston did not ejaculate into her mouth. Candida claimed that Winston then licked her vagina, lifted up her shirt and bra, and sucked on one of her breasts. She testified that he may have sucked on both of her breasts, but that she could not remember because she was intoxicated at that time:
Q. Do you remember telling [a detective] that M.C. had started sucking on your breasts, both of them?
A. Yes.
Q. Is that what happened?
....
A. I don't remember him sucking on both, but I remember one.
Q. Could he have sucked on both?
A. Could have.
Q. You just don't remember?
A. Yes.
Q. Why don't you remember some of this?
A. Because I was intoxicated.
Q. But what you've been testifying to, do you remember that?
A. Yes.
Candida claimed that Winston then put his penis in her vagina. She testified that he did not ejaculate into her vagina.
¶8 According to Candida, she told Winston to stop and he did. Candida then put on her pants and shoes and left the store. Candida testified that she "[k]ind of" remembered walking to the house of her friend, Christine. At Christine's house, Christine and another friend, Katie, found Candida sitting on the stairs to Christine's house and took Candida to Katie's house. According to Candida, while they were walking to Katie's house, she stumbled because she was drunk and Christine grabbed the back of Candida's pants to help her walk. Christine then noticed that Candida did not have on any underwear and asked her where it was. Candida testified that the next thing she remembered was arriving at Katie's house and lying on Katie's bed. Candida's mother then came to Katie's house, and Candida and her mother went to the hospital. Candida testified that she was examined at the hospital and spoke to a police detective. She told the jury that she was "coming down" from the alcohol when she talked to the detective.
¶9 Jody Young, the police officer who collected evidence in the case, also testified. Young told the jury that she watched a nurse draw two vials of Winston's blood. Young testified that, after the nurse drew Winston's blood, the nurse gave it to Young, and Young took the blood to the Milwaukee Police Department and placed it on inventory, as number 180792.
¶10 Sharon Polakowski, a forensic scientist in the DNA Analysis Unit at the State Crime Laboratory, testified that she compared DNA extracted from Winston's blood to DNA extracted from swabs of Candida's neck and breasts. She opined, to a reasonable degree of scientific certainty, that Winston was a major contributor of DNA extracted from the swabs. Polakowski told the jury that she did not find any semen on oral or vaginal swabs taken from Candida.
¶11 Scott Rinderle, a detective with the Milwaukee Police Department, testified that he received a dispatch around 4:00 p.m. on October 5, 2001, indicating that a sexual assault had occurred. He began his investigation at the house of Candida's friend, Katie. He told the jury that Candida was not there when he arrived because an ambulance had taken Candida and her mother to the hospital. He thus interviewed an employee at the Kandy Konnektion, and went to the hospital to interview Candida. Rinderle testified that he interviewed Candida at "approximately" 5:00 p.m. He could not recall whether he smelled any alcohol on her during the interview, but testified that Candida told him that she had been drinking gin and lemonade while she was at the store. After Rinderle interviewed Candida, he went back to the store. He testified that he shined an ultraviolet light designed to detect the presence of semen on a mattress in the storage room, but that he did not find any evidence of semen.
¶12 Winston also testified in his defense. He told the jury that, on October 5, 2001, Candida came into the Kandy Konnektion to buy cigarettes. According to Winston, he, Candida, and another employee went into the storage room, sat on a mattress, and talked. Candida left for about fifteen to twenty minutes and returned with a forty-ounce bottle of beer. According to Winston, Candida told him a joke and he spit a mouth full of beer onto her face and hair. Winston admitted that his DNA was on Candida:
Q. So you're not denying that your DNA was on her neck, correct?
A. Correct, I'm not denying.
Q. You're not denying that your DNA was on her breasts, correct?
A. I don't even know if my DNA was on her breast. My DNA was on her face, her hair, on the front part of her shirt.
Q. DNA is DNA. You had no reason or reasonable basis to not believe her to say that your DNA wasn't found on her breast, correct?
A. Correct.
Q. You're not saying that the Crime Lab scientist didn't know what she was doing, correct?
A. No.
Q. You are basically saying that the reason your DNA got on her neck and her breasts is that you spit on her?
A. Yes.
Winston denied that he had sexual contact or sexual intercourse with Candida.
¶13 The jury found Winston guilty of second-degree sexual assault based on sexual contact, but found him not guilty of second-degree sexual assault based on sexual intercourse. The trial court sentenced Winston to thirty years in prison, comprised of twenty years of confinement and ten years of extended supervision.
¶14 Winston filed a postconviction motion alleging that: (1) the State violated due process and WIS. STAT. § 971.23(1)(h) (discovery and inspection; exculpatory evidence) when it failed to turn over Property Inventory 180783; (2) Inventory 180783 was newly-discovered evidence; (3) his lawyer at the second trial gave him ineffective assistance when the lawyer did not request a copy of Inventory 180783; (4) he was entitled to a new trial in the interest of justice because the real controversy was not tried due to the absence of Inventory 180783; and (5) his lawyer at the second trial rendered ineffective assistance when the lawyer failed to request a copy of the transcripts from the first trial to use for impeachment purposes. The trial court denied the motion without a hearing.

II.

A. Alleged Failure to Disclose Exculpatory Evidence 
¶15 Winston contends that the trial court erred when it denied without an evidentiary hearing his claim that the State violated due process and WIS. STAT. § 971.23(1)(h) when it failed to give his lawyer Property Inventory 180783. He alleges that he is entitled to an evidentiary hearing because his postconviction motion and the accompanying affidavits raised a question of fact concerning the chain of custody of the blood sample tested by the State crime laboratory. We disagree.
¶16 Winston attached a copy of Property Inventory 180783 to his postconviction motion to support his claim. The inventory indicated that it had been prepared at 1:40 p.m. on December 17, 2001. Jody Young was the submitting officer and the inventory showed that she had collected three yellowtopped vials of Winston's blood from the House of Correction. The word "void" was written across the inventory in large capital letters.
¶17 Winston also attached two affidavits. The first affidavit was from the assistant state public defender who submitted Winston's postconviction motion. In the affidavit, the assistant public defender stated that, "[b]ased upon the information obtained when investigating th[e] case," she believed that Winston would testify as follows at an evidentiary hearing:
 He is diabetic and his blood was often drawn while he was at the House of Correction. On December 17, 2001, his blood was drawn at approximately 7:00 a.m.
 He remembers December 17, 2001, because it was his brother's birthday and his encounter with Young was "memorable."
 While he was on the telephone with his brother, a doctor called him into a room to have his blood drawn. Winston "estimates" that this happened between 11:00 a.m. and 1:00 p.m.
 A nurse, Young, and the man were in the room. Young watched his blood being drawn.
 Young asked Winston for his social security number and he gave it to her after Young threatened to have Winston put in the "hole." Young also took Winston's thumbprint and put the vials of blood in a bag. Winston does not remember what color the tops of the vials were.
¶18 The second affidavit was from a senior investigator at the Office of the State Public Defender. The investigator alleged that she interviewed Young over the telephone. Young told the investigator that, on December 17, 2001, at approximately 1:40 p.m., she went to the Milwaukee County House of Correction to "participate" in a blood draw from Winston. At the House of Correction, someone handed three yellow-topped vials of blood to her. After Young had returned to her office, she discovered that she had the wrong vials. She went back to the House of Correction and gave back the yellow-topped vials. Young told the investigator that, "later that afternoon," she witnessed blood being drawn from Winston and was given two purple-topped vials of blood. She inventoried the purple-topped vials as Property Inventory 180792.
¶19 The investigator also testified that she requested Winston's medical records from the House of Correction. The records that she received showed one blood draw on December 17, 2001, at 7:35.[2] The investigator testified that she then asked the Criminal Justice Facility Health Record Department to send copies of all notes related to Winston's blood draws and the names of nursing staff who administered the blood draw. The investigator was referred to Nursing Supervisor Barbara Stelloh. Stelloh told the investigator that blood draws are conducted by court order. A police officer goes to the House of Correction with the order and someone draws the blood from the inmate while the officer is present. Stelloh told the investigator that "`there was no documentation [in the file] as to what occurred.'" (Brackets in original.)
¶20 In his postconviction motion, Winston alleged that the discrepancies in his and Young's respective versions of the blood draws, as recited in the affidavits, provided a sufficient basis upon which to question Young's credibility:
Police and House of Correction protocol require an officer to be present when blood is drawn for evidentiary purposes. Both Officer Young and Mr. Winston agree that there was only one blood draw for evidentiary purposes. Although Officer Young claimed to be confused about protocol, she had been working for the Sensitive Crime Unit for under three years, and had been involved in previous blood draws. It strains credulity to believe that she simply would walk into the House of Correction[] for a blood draw and take blood handed to her from someone she did not know without any further assurance that the blood belonged to Mr. Winston. What is more credible is that, as Mr. Winston says, Officer Young was present for a blood draw in the middle of the day on December 17, 2001. Most likely, she then returned to her office and discovered that she had the wrong color top on the vials, having brought back yellow-topped vials instead of purple-topped vials. Having made that mistake, she then returned to the House of Correction[] and, instead of having a second blood draw done, she exchanged the vials she had for other vials. In doing so, she made it impossible to tell whether the vials of blood ultimately inventoried and conveyed to the State Crime Lab contained Mr. Winston's blood.
(Exhibit references omitted.) It is on this basis that Winston now claims that he was entitled to an evidentiary hearing. We disagree.
¶21 Before a trial court must grant an evidentiary hearing, the defendant must allege sufficient facts to raise a question of fact for the reviewing court. State v. Washington, 176 Wis. 2d 205, 214-216, 500 N.W.2d 331, 335-336 (Ct. App. 1993). "Whether a motion alleges facts which, if true, would entitle a defendant to relief is a question of law that we review de novo." State v. Bentley, 201 Wis. 2d 303, 310, 548 N.W.2d 50, 53 (1996). If, however:
"the defendant fails to allege sufficient facts in his motion to raise a question of fact, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the trial court may in the exercise of its legal discretion deny the motion without a hearing."
Id., 201 Wis. 2d at 309-310, 548 N.W.2d at 53 (quoted source omitted).
¶22 "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87 (1963). A defendant is entitled to a new trial if he has shown by clear and convincing evidence that: (1) the State failed to produce the evidence; (2) the evidence not produced was in the sole knowledge or control of the State; (3) the evidence was favorable to the defendant; and (4) the evidence was material to the defendant's guilt or innocence. Rohl v. State, 90 Wis. 2d 18, 29-30, 279 N.W.2d 722, 725 (Ct. App. 1979), rev'd in part on other grounds, 96 Wis. 2d 621, 292 N.W.2d 636 (1980).
¶23 Winston's claim fails on the fourth prong, i.e., he cannot show that Property Inventory 180783 was material to his guilt or innocence. Simply put, Winston never disputed that: (1) he was with Candida when she claims he assaulted her; and (2) his DNA was on her body. Thus, Inventory 180783 was not material to his guilt or innocence, irrespective of how it might have been handled. See United States v. Bagley, 473 U.S. 667, 682 (1985) (Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."). The trial court properly denied this claim without an evidentiary hearing.

B. Newly Discovered Evidence 
¶24 Winston alleges that the trial court erred when it denied without an evidentiary hearing his claim that Property Inventory 180783 was newly discovered evidence. In his postconviction motion, Winston relied on the same argument that he made in the exculpatory-evidence section to argue that that Inventory 180783 was materialthat there was a reasonable probability that, had Inventory 180783 been disclosed, the result of his trial would have been different. Again, we disagree.
¶25 A defendant seeking a new trial on the basis of newly discovered evidence must show by clear and convincing evidence that: (1) the evidence came to the moving party's notice after trial; (2) the moving party's failure to discover the evidence earlier did not arise from a lack of diligence in seeking to discover it; (3) the evidence is material and not cumulative; and (4) the new evidence would probably change the result. WIS. STAT. § 805.15(3); see also State v. Carnemolla, 229 Wis. 2d 648, 656, 600 N.W.2d 236, 240 (Ct. App. 1999).
¶26 Here, Winston's claim fails on prong four of the testthat had Property Inventory 180783 been disclosed, the result of his trial would have been different. As we have already noted, the existence or non-existence of the yellowtopped vials and the voided inventory sheet that accompanied them, Inventory 180783, was immaterial to the main issue in this case, i.e., the issue of how Winston's DNA got on Candida's neck and breasts. Thus, the trial court properly denied this claim without an evidentiary hearing.

C. Ineffective Assistance of Trial Counsel 
¶27 Winston alleges that the trial court erred when it denied without an evidentiary hearing his claim that the lawyer at the second trial rendered ineffective assistance. The familiar two-pronged test for ineffective-assistance-ofcounsel claims requires a defendant to prove: (1) deficient performance; and (2) prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). To prove deficient performance, a defendant must show specific acts or omissions of counsel that are "outside the wide range of professionally competent assistance." Id. at 690. There is a "strong presumption that counsel acted reasonably within professional norms." State v. Johnson, 153 Wis. 2d 121, 127, 449 N.W.2d 845, 848 (1990).
¶28 To prove prejudice, a defendant must show that counsel's errors were so serious that the defendant was deprived of a fair trial and a reliable outcome. Strickland, 466 U.S. at 687. In order to succeed, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
¶29 Our standard for reviewing this claim involves mixed questions of law and fact. Johnson, 153 Wis. 2d at 127, 449 N.W.2d at 848. Findings of fact will not be disturbed unless clearly erroneous. Id. The legal conclusions, however, as to whether counsel's performance was deficient and prejudicial, present questions of law. Id., 153 Wis. 2d at 128, 449 N.W.2d at 848. Finally, we need not address both Strickland prongs if the defendant fails to make a sufficient showing on either one. Id., 466 U.S. at 697.
¶30 Winston made two claims of ineffective assistance in his postconviction motion. First, he alleged that his second trial lawyer was ineffective because he did not get a copy of Property Inventory 180783. We disagree. As we have noted several times, the existence or non-existence of the yellow-topped vials and the voided inventory was immaterial. Thus, Winston's claim fails on the prejudice prong. He has not shown that there is a reasonable probability that, had his trial lawyer obtained Inventory 180783, the result of his trial would have been different.
¶31 Second, Winston alleged that his second trial lawyer was ineffective because he did not order the transcripts from the first trial. In his postconviction motion, he claimed that there were discrepancies in witness testimony. Specifically, Winston pointed to discrepancies between Candida's testimony at the first trial and her testimony at the second trial:
 At the first trial Candida testified that she did not know if Winston had ejaculated into her vagina. At the second trial, Candida testified that she was "sure" that Winston did not ejaculate into her vagina.
 At the first trial, Candida testified that, after the assault, she did not remember how she got from the store to Christine's house. At the second trial, Candida testified that she "[k]ind of" remembered walking from the store to Christine's house. After Christine and Katie found her sitting on the stairs to Christine's back door, Christine and Katie walked Candida to Katie's house. Candida testified that she was stumbling because she was drunk, so Christine grabbed the back of her pants. According to Candida, Christine then noticed that Candida did not have any underwear on and asked her what happened to them.
Winston also pointed to the following discrepancies in Detective Scott Rinderle's testimony:
 At the first trial, Rinderle testified that he received a dispatch about a sexual assault at 4:30 p.m. and that he interviewed Candida "some time after 5:30." At the second trial, Rinderle testified that he received a dispatch around 4:00 p.m. and that he interviewed Candida at "approximately five o'clock p.m."
 At the first trial, Rinderle testified that Candida told him that she was "very, very intoxicated" during the interview, but that he could not tell if her demeanor was due to stress or alcohol. At the second trial Rinderle indicated that Candida was "fairly calm" when he interviewed her.
Winston claimed that the lawyer could have used the inconsistencies in Candida's testimony to "undercut [her] credibility substantially." He also argued that "[i]t could have been established that Detective Rinderle might have interviewed Candida later in the afternoon when more of the alcohol had had a chance to wear off, and that she might have been more intoxicated than his testimony at the second trial made it appear." (Transcript references omitted.) We disagree.
¶32 A lawyer is not ineffective for failing to impeach a witness based on minor inconsistencies that would not have affected the verdict. State v. DeLeon, 127 Wis. 2d 74, 85, 377 N.W.2d 635, 641 (Ct. App. 1985). Here, the differences in Candida's testimony were de minimis. As the postconviction court noted, at both trials Candida testified that Winston laid her down, took off her pants and underwear, took his penis out and put it in her mouth, licked her vagina, and put his penis in her vagina. Given Candida's testimony and the fact that Winston's DNA was found on her neck and breasts, Winston has not pointed to anything that would "substantially ... undercut" Candida's version of the facts.
¶33 Moreover, we fail to see how the differences in Rinderle's testimony would have affected the jury's assessment of Candida's level of intoxication. At both trials, Rinderle testified that, during the interview, Candida told him that she had consumed alcohol. Moreover, Candida testified that she had consumed alcohol and could "feel' its effects during and after the assault occurred. The jury was fully aware that Candida had consumed alcohol on the day of the assault. Winston was not prejudiced by his lawyer's failure to order the transcripts from the first trial. Thus, the trial court properly denied this claim without an evidentiary hearing.

D. Interest of Justice
¶34 Winston contends that the trial court should have granted an evidentiary hearing on his claim that he was entitled to a new trial in the interest of justice. See WIS. STAT. § 805.15(1). In his postconviction motion, he claimed that the real controversy had not been fully tried due to the absence of Property Inventory 180783. We disagree. As we have seen, the real controversyhow Winston's DNA got on Candida's neck and breastswas fully presented to the jury.
By the Court.  Judgment and order affirmed.
NOTES
[1] All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.
[2] The affidavit does not indicate whether the time was 7:35 a.m. or 7:35 p.m.